**UNITED STATES DISTRICT COURT FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **UNITED STATES OF AMERICA** | )( |
| | )(     **Criminal No. 07-288** |
| **v.** | )(     **Judge Friedman** |
| | )(     **Motions Hearing: May 1, 2008** |
| **EDWARD MADDOX** | )( |

**MEMORANDUM OF POINTS AND AUTHORITY
IN SUPPORT OF DEFENDANT'S MOTION
TO SUPPRESS EVIDENCE, STATEMENTS, AND INFORMATION**

COMES NOW the defendant, Edward Maddox, by and through undersigned counsel, and respectfully submits this memorandum of points and authority in support of his earlier filed Motion to Suppress Evidence, Statements, and Information (Motion to Suppress).

**STATEMENT OF FACTS**

On September 29, 2007, police officers executed a search warrant at 5025 Sheriff Road, N.E.  It was believed that Mr. Maddox was using the residence for drug-related activities.  When the police went to execute the search warrant, they determined that Mr. Maddox was not home, so they waited for him to arrive before executing the warrant. When Mr. Maddox arrived in the neighborhood, he parked his car on a nearby street. While he was parking his car, a police car was used to block Mr. Maddox's car, and Mr. Maddox was seized as he was exiting his car.  At this point, Mr. Maddox was taken to the residence and the search warrant was executed.  Eventually, a drug-detection dog was brought in to sniff around the car.  The dog gave an alert indicating that drugs were present in the car, and the car was searched.  In his Motion to Suppress, Mr. Maddox seeks to suppress all evidence that was recovered from the residence during the search,

all evidence that was recovered from his person and all statements made by him after his seizure, and all evidence recovered from his car.  An evidentiary hearing on Mr. Maddox's Motion to Suppress was held on March 26, 2008.

At the evidentiary hearing on Mr. Maddox's Motion to Suppress, the government's first witness was Detective Thomas Sydnor.  Tr. at 4.  Detective Sydnor explained that he is a member of the Canine Unit with the Metropolitan Police Department.  Detective Sydnor testified that he works with a dog named Cigi, who is specially trained to detect the presence of certain drugs.  Tr. at 5-10.  Detective Sydnor testified that, on the morning of September 29, 2007, he and Cigi "deployed out to the area" as part of the team that was going to execute the search warrant for 5025 Sheriff Road, N.E.  Tr. at 11.  Detective Sydnor stated that, once he got the area, he and Cigi waited in a hidden location until he was instructed that his and Cigi's services were needed.  Tr. at 11, 19.  Once he got word that their services were needed, Detective Sydnor responded with Cigi to a location where the Detective observed Mr. Maddox's car parked on a public street.  Tr. at 17, 19.  Sergeant Neill was present by the car and he requested that Detective Sydnor walk Cigi around the car.  Tr. at 12.  Detective Sydnor did so, and Cigi ended up making an alert that indicated to the Detective that drugs were present inside the car.  Detective Sydnor communicated this information to Sergeant Neill, and then he "gave Cigi his fetchy toy and put him back in the car."  Tr. at 16-17.  Detective Sydnor testified that he did not participate in any search of the car and that he did not assist in the execution of the search warrant at 5025 Sheriff Road, N.E.  Tr. at 17-18.  More specifically, regarding the duties he performed on the morning of September

29, 2007, the Detective stated, "The only thing I performed was the sweep of the vehicle." Tr. at 25.

After Detective Sydnor finished testifying, the government called Sergeant Gerald Gene Neill, Jr. of the Metropolitan Police Department as its next witness. Tr. 27. Sergeant Neill testified that he, too, was part of the team that was going to execute the search warrant at 5025 Sheriff Road, N.E. on September 29, 2007. Tr. at 28. He testified that he first arrived at the scene moments after he was advised by other officers that Mr. Maddox was pulling up in his car. Sergeant Neill stated that he arrived at the scene "moments after the stop." The Sergeant explained that there were other officers waiting for Mr. Maddox to arrive and that "Officer Copeland was the first one to stop him." Sergeant Neill stated, "[B]y the time I got there Officer Copeland had Mr. Maddox out of the car." Tr. at 28-29. Sergeant Neill testified that, at some point after he arrived at the car, "Officer Sydnor came up and he had the dog, K-9 dog. We took the K-9 dog and he walked it all around the car and [the dog] alerted on the car." Tr. at 30. At this point, the police "opened up the car and began to search." Tr. at 33. Ultimately, according to Sergeant Neill, the police found some small bags containing alleged heroin on the floor of the car and a pistol in the trunk. Tr. at 33. The bags of alleged heroin were purportedly found under a floormat. Tr. at 38.

During his testimony, Sergeant Neill acknowledged that, at some point after Mr. Maddox had been stopped and while he was still at the car, the police placed Mr. Maddox in handcuffs. Tr. at 37. Additionally, the Sergeant stated that, at some point during the events at issue, he looked inside the car and saw a small green plastic Ziploc in one of the car's cup holders. Tr. at 31-32. The bag was empty. Tr. at 38. The Sergeant stated that

he believed the Ziploc was evidence of drug activity.  Tr. 40.   The Sergeant did not say

when it was in relation to the seizure of Mr. Maddox that he observed the empty Ziploc.

However, given that Sergeant Neill had testified that Mr. Maddox had already been

stopped by Officer Copeland before the Sergeant ever even arrived at the car, it is clear

that any observation of a green Ziploc that the Sergeant might have made would have

occurred after Mr. Maddox's seizure.  It is important to note that there is no evidence that

Sergeant Neill ever communicated his purported observation of the Ziploc to anyone else.

Additionally, the Sergeant acknowledged that, despite the Ziploc's admitted evidentiary

value, the Ziploc was never taken into evidence.  Tr. at 40.

        After Sergeant Neill, the government called Detective Kevin A. Copeland of the

Metropolitan Police Department to the stand.  Tr. at 42.  Detective Copeland testified

that, on the morning of September 29, 2007, the police did not want to execute the search

warrant for 5025 Sheriff Road, N.E. until after Mr. Maddox had been apprehended.  Tr.

at 100, 105.  The Detective testified that the police went to execute the warrant at a time

when it was believed that Mr. Maddox would be actively engaged in his alleged drug-

distribution activities.  Tr. at 70, 74.  The Detective explained, "We were there to

apprehend [Mr. Maddox] and catch him with drugs on him."  This was the "plan."  Tr. at

100.  Accordingly, before executing the search warrant, the police went to the location

where they believed Mr. Maddox would in fact be selling drugs.  Evidently, they

intended to actually seize Mr. Maddox there.  However, when they did not see him at that

location, they simply waited for Mr. Maddox in the vicinity of 5025 Sheriff Road, N.E.

Tr. a 70, 100.  Some police officers had already been stationed at that location to conduct

surveillance, and the police knew that Mr. Maddox was not present on the premises

because the surveillance officers had determined that Mr. Maddox's car was not parked

anywhere in the area.  Tr. at 71, 98.  Thus, the police simply waited until Mr. Maddox

arrived at the location in his car so that they could seize him then before executing the

search warrant.  Tr. 70-71.

Detective Copeland testified that, at around 7:00 a.m., he was informed by the

undercover officers that had been stationed in the vicinity of 5025 Sheriff Road, N.E. that

Mr. Maddox was arriving at the location and parking his car.  Tr. at 71.  The Detective

then immediately drove his car to the location and "pulled in front of [Mr. Maddox's]

vehicle with my vehicle."  Detective Copeland expressly stated, "I blocked [Mr.

Maddox's] vehicle," tr. at 71, and he repeated this assertion a few moments later, tr. at

72.  At this point, the Detective jumped out of his car and confronted Mr. Maddox as Mr.

Maddox was exiting his car.  Tr. at 71-72.  Detective Copeland then told Mr. Maddox

who he was and explained to him that he and the other police officers were there to

execute a search warrant.  Tr. at 72, 101.  Further, Detective Copeland patted Mr.

Maddox down for weapons, and during the pat-down, the Detective went into Mr.

Maddox's pocket and retrieved his keys.  Tr. at 73, 102.  Additionally, Mr. Maddox was

placed in handcuffs.  Tr. at 72, 101-02.  Then, Detective Copeland and seven or eight

other officers escorted Mr. Maddox from the car to 5025 Sheriff Road, N.E.  Tr. at 101,

107-08.  At this point, "the drug dog hadn't arrived yet," and there had yet to be any

search of the car.  Tr. 73.  Accordingly, "several sergeants and several people [other

police officers]" stayed with the car, waiting for the dog to arrive and to search the car.

Tr. at 107-08.

Once Detective Copeland and the seven or eight other officers who went with him had escorted Mr. Maddox to 5025 Sheriff Road, N.E., they used the keys that they had retrieved from Mr. Maddox's pocket to enter the premises and began executing the warrant.  Tr. at 73, 102.  During the execution of the warrant, the police allegedly recovered various quantities of drugs, drug-distribution paraphernalia, and personal papers and effects of Mr. Maddox.  See Government's Exhibit Number 7, seizure list; Government's Exhibit Number 8, photograph of recovered items.  While the warrant was being executed, Mr. Maddox, in an apparent effort to exonerate his nephew (who was found to be present on the premises and who was being taken into custody), allegedly confessed that all of the drugs being recovered in the house were his and his alone.  Tr. at 105-06.

While on the stand, Detective Copeland testified about the affidavit in support of the search warrant for 5025 Sheriff Road, N.E. (Affidavit), which the Detective himself had sworn out.  Tr. at 47.  The Affidavit is attached.  Attachment.  In the Affidavit, Detective Copeland states that, for the past month, he has been briefed by a confidential informant who has knowledge of Mr. Maddox's activities.  According to the Affidavit, this informant claims that Mr. Maddox sells drugs on the street and carries a pistol while doing so.  Affidavit at 2.  In his testimony at the evidentiary hearing, the Detective made it clear that, when the confidential informant told him that Mr. Maddox sells drugs and carries a pistol, the informant was communicating information that he had acquired from his own personal observations.  Tr. at 54, 81.  Detective Copeland stated that, in the month prior to applying for the search warrant, he was speaking with the confidential informant two or three times a week.  Tr. at 54.  During these meetings, the informant

was telling Detective Copeland that he was personally witnessing Mr. Maddox selling

drugs while armed with a pistol "[p]retty much everyday." Tr. at 81-82. Additionally, in

the Affidavit, Detective Copeland states that, on at least three different occasions, he has

personally observed Mr. Maddox engage in a number of hand-to-hand transactions with

different persons wherein Mr. Maddox would give the other persons a small object in

return for money. These transactions all occurred in an area that is well known as an

open-air drug market. Moreover, these transactions all occurred in the morning before

8:00 a.m., which is time that the Detective claims heroin dealers typically conduct their

business. According to the Detective, unlike cocaine, heroin is a "morning" drug.

Affidavit at 2. During the evidentiary hearing, Detective Copeland reiterated that he had

personally observed Mr. Maddox engaging in numerous hand-to-hand transactions on

each of the three or more occasions in which the Detective surveilled Mr. Maddox

apparently engaging in drug-dealing at the open-air drug market. Tr. at 80.

In the Affidavit, there are only three assertions that connect Mr. Maddox to 5025

Sheriff Road, N.E. and thereby provide any possible grounds for finding probable cause

to search that location. The first assertion is one in which Detective Copeland simply

states, "Through other police investigative techniques I have developed other information

indicating that Maddox regularly uses the town-house at 5025 Sheriff Road, N.E., as a

base of operations before going out to sell heroin each morning." Affidavit at 2.

However, in the Affidavit, the Detective does not in any way explain what these "other

police investigative techniques" were, nor does he say what "information" he developed

through the use if these investigative techniques or how that information supports the

conclusion that Mr. Maddox does in fact use 5025 Sheriff Road, N.E. as a base of

operations for his alleged drug-dealing activities. After making this assertion about having developed information indicating that Mr. Maddox uses 5025 Sheriff Road, N.E. as a base of operations, Detective Copeland then goes on to assert, "Further, I have learned that another resident of the house at 5025 Sheriff Road, N.E., is Mr. Maddox's close family member." Affidavit at 2. This is the second assertion that Detective Copeland makes to establish a connection between Mr. Maddox and 5025 Sheriff Road, N.E. However, the Detective does not explain how he learned that a family member of Mr. Maddox resides at 5025 Sheriff Road, N.E., what the ultimate source of the information was, or what basis of knowledge underlay it.

As if realizing that his first two assertions regarding Mr. Maddox's connection with 5025 Sheriff Road, N.E. provide insufficient bases for a finding of probable cause to search the location, Detective Copeland immediately goes on in the Affidavit to state, "To corroborate the information about Maddox's use of 5025 Sheriff Road, I have undertaken surveillance of the premises at that address. I have done this on at least three occasions. These included observations made in early morning hours, such as 3:00 a.m. or 4:00 a.m., when I would suspect that persons in the address would be asleep." Affidavit at 2. The Detective then states that, on all the occasions he surveilled 5025 Sheriff Road, N.E., he observed a car that he associates with Mr. Maddox "parked at this address." Id. This is the third and final assertion that Detective Copeland makes in the Affidavit regarding Mr. Maddox's connection to 5025 Sheriff Road, N.E. According to the Affidavit, the reason that Detective Copeland associated Mr. Maddox with the car he observed "parked at" 5025 Sheriff Road, N.E. is because the Detective knew that Mr. Maddox had been stopped in that car on June 6, 2007. Id. There is no other information

in the Affidavit connecting Mr. Maddox to the car that Detective Copeland observed "parked at" 5025 Sheriff Road, N.E. Moreover, it should be emphasized that the fact that the car was "parked at this address" is the only reason the Detective gives for concluding, in turn, that the car connected Mr. Maddox to 5025 Sheriff Road, N.E.

Earlier in the Affidavit, Detective Copeland addressed the stop of Mr. Maddox's car that occurred on June 6, 2007. In this earlier portion of the Affidavit, the Detective states that he "consulted with other police officers[] and… learned that an MPD sergeant stopped a car being driven by Maddox" on that date. Affidavit at 2. The Detective then goes on to state that "the police seized heroin from near the site of the traffic stop." Id. Further, the Detective states, "I have learned from police records that the car in which Mr. Maddox was stopped is registered to him as well as another person." Id. However, in cross-examination during the evidentiary hearing, the Detective admitted that Mr. Maddox was actually never seen driving the car in which he was supposedly stopped on June 6, 2007. Though the Detective, in the Affidavit, described the event as a "traffic stop" and referred to the car as one "in which Mr. Maddox was stopped" and as one "being driven by Maddox," as it turns out, the police only found and searched an unoccupied, parked car on that date. Tr. at 85, 91-93. Moreover, on cross-examination, the Detective ended up admitting that, on June 6, 2007, no drugs were ever found near the site of the car—or anywhere else for that matter. Tr. at 85-86, 91. Finally, on cross-examination, the Detective admitted that, despite his assertion in the Affidavit to the contrary, the car at issue was not registered to Mr. Maddox at all. Tr. at 87-88.

During his testimony at the evidentiary hearing, Detective Copeland clarified what he meant in the Affidavit when he said that he had observed Mr. Maddox's car

"parked at this address [5025 Sheriff Road, N.E.]."  According to the Detective, in the area where 5025 Sheriff Road, N.E. is located, "They don't have driveways, it's just street parking only."  Tr. at 57.  The Detective acknowledged that 5025 Sheriff Road, N.E. is one of twelve units in a townhouse complex and that, on either side of this complex, there are identical complexes going "all down the road."  Across the street, there are houses.  Tr. at 95.  The Detective further acknowledged that, given the population density, parking on the streets is scarce and that people parking in the neighborhood just park wherever they can find a space.  Tr. at 57, 94.  Regarding where Mr. Maddox's car actually was when he claimed that he saw the car "parked at" the address of 5025 Sheriff Road, N.E., the Detective stated that what he meant was that sometimes he saw the car parked on the same side of the street as the complex in which the residence is located, sometime he saw it parked on the opposite of the street, and sometimes he saw it parked on a different street altogether.  Tr. at 57, 94.  Thus, though the Detective linked the car to 5025 Sheriff Road, N.E. by saying that he observed the car "parked at this address," the truth is that the Detective had only seen the car parked in the area wherein the address was located, a fact that—especially since people in the area just park wherever they can find a space—would no more link the car to 5025 Sheriff Road, N.E. than it would to any other residence in the neighborhood.

During his testimony at the evidentiary hearing, Detective Copeland acknowledged that—despite his assertions in the Affidavit to the contrary—the car that he had observed "parked at" 5025 Sheriff Road, N.E. was in fact not the same car that had been involved in the events of June 6, 2007.  Tr. at 58-63.  Thus, even if Mr. Maddox had been seen driving the car involved in the events of June 6, 2007 and even if the car

that the Detective observed "parked at" 5025 Sheriff Road, N.E. could actually be connected to that specific address, there still would be no grounds to connect Mr. Maddox to the address because, as it turns out, the car involved in the events of June 6, 2007 was not even the same car that was "parked at" 5025 Sheriff Road, N.E. to begin with.

During his testimony, the Detective claimed that, prior to applying for the search warrant, he had accurate information on both cars. Tr. at 66, 88-90. Moreover, in the Affidavit, the Detective stated that he learned from the police records the license plate number of the car involved in the incident of June 6, 2007, Affidavit at 2, and during his testimony at the evidentiary hearing, the Detective claimed that he knew the license plate number of the car he saw "parked at" 5025 Sheriff Road, N.E., tr. at 59, 61-62. Moreover, during the evidentiary hearing, the Detective claimed that, even though he was mistaken about the fact that the car involved in the events of June 6, 2007 was registered to Mr. Maddox, the car that was "parked at" 5025 Sheriff Road, N.E was in fact registered to Mr. Maddox and that he knew this all along. However, the fact that the car "parked at" 5025 Sheriff Road, N.E. was registered to Mr. Mr. Maddox would have been at odds with the records the Detective checked for the car involved in the events of June 6, 2007 (which was in fact not registered to Mr. Maddox). Nevertheless, despite the fact that everything the Detective claims he knew about the two cars would have shown that they were entirely different cars altogether, the Detective claimed at the evidentiary hearing that he mistakenly thought the two cars were the same. Tr. at 60, 66-67, 88-90.

In the Affidavit, Detective Copeland vouches for the reliability of the confidential informant who gave him information regarding the fact that Mr. Maddox sells drugs

while armed.  In the Affidavit, the Detective states that the informant has provided him

information that has led to "the seizure of two handguns, and a very substantial heroin

seizure of more than 400, plus $174,000 in U.S. currency."  Affidavit at 2.  During the

evidentiary hearing, Detective Copeland explained that all of the evidence seized because

of the informant's information that was cited in the Affidavit was related to a single

event.  Tr. at 45-46.  This event had occurred "four or five years ago."  Tr. at 49, 98.

None of this information was included in the Affidavit.  Further, during the evidentiary

hearing, the Detective stated that, since the event of four or five years ago, the informant

has continued to give him information.  However, the Detective indicated that he did not

follow up on any of the information that the informant has given him in the past four or

five years and that he could not vouch for the reliability of any of it.  Tr. at 49, 99.  This

fact too was not disclosed in the Affidavit.

## ARGUMENT

### A.  Illegal Seizure of Mr. Maddox

Here, just before executing the search warrant for 5025 Sheriff Road, N.E, the

police seized Mr. Maddox when Detective Copeland blocked Mr. Maddox's car with the

Detective's car, confronted Mr. Maddox as he was exiting his car, patted him down for

weapons, took his keys from out of his pocket, and then—in the company of seven or

eight other officers—escorted Mr. Maddox (who had been placed in handcuffs) from the

car to 5025 Sheriff Road, N.E.  This seizure was effected without a warrant.  Moreover,

at the time that the police seized Mr. Maddox, they had observed nothing at the location

where he was seized to give them probable cause or even a reasonable suspicion that he

was engaged in illegal activity.  Given that Sergeant Neill did not arrive at the car until after Detective Copeland had seized Mr. Maddox, Sergeant Neill's purported observation of the empty green Ziploc inside the car cannot be used to justify Mr. Maddox's seizure.[1] Moreover, since Detective Copeland and seven or eight other officers had removed Mr. Maddox from the car to 5025 Sheriff Road, N.E. before the drug-detection dog had even arrived on the scene, nothing that the dog did and nothing that was found in the subsequent search of the car can be used to justify Mr. Maddox's seizure.

It should be pointed out at this point that, in opposition to Mr. Maddox's Motion to Suppress, the government does not seek to justify the detention of Mr. Maddox based on any grounds that arose at the location of the seizure.  Rather, the government claims that the seizure can be justified because it was effected pursuant to the execution of the search warrant.  Government's Opposition to Defendant's Motion to Suppress, Statements, and Other Information at 14-15.  In support of this position, the government cites to Michigan v. Summers, 452 U.S. 692 (1981).  Id.  In Summers, the Supreme Court confronted a situation where police officers approaching a certain residence to execute a search warrant happened to run into the owner as he was descending the front steps on his way out.  The police detained the owner and entered the residence.  In the subsequent search of the residence, the police recovered drugs.  The owner was then placed under arrest, and in a search incident to arrest, the police found drugs on the owner's person.  In court, the owner sought to suppress the drugs recovered from his person as the fruits of

---

[1] Even if Sergeant Neill had seen the empty green Ziploc prior to Mr. Maddox's seizure, it is highly doubtful that this fact alone would have supplied even a reasonable suspicion for the seizure.  See United States v. Williams, 346 F.Supp.2d 934, 939 (E.D. Mich. 2004) (defendant's possession of empty sandwich bags, even when coupled with defendant's erratic driving and hurried, late-night travel plans, does not provide reasonable suspicion); State v. Shoulderblade, 905 P.2d 289, 295 (Utah 1995) (where officer observed defendant stuff a clear plastic sandwich bag between front seats of car, there was not reasonable suspicion).  Mr. Maddox is aware of no cases that hold that the observation of a single, empty Ziploc bag alone provides a reasonable suspicion for a seizure.

his initial warrantless seizure on the front steps, which he claimed was illegal. Id. at 693-94. The Supreme Court, however, rejected the owner's contention, finding that the owner's seizure on the steps was in fact legal. The Court held that, when a person is found to be present on the premises during the execution of a search warrant, the fact that the person is present at a place where a judicial officer has found probable cause to believe that someone is committing a crime provides the police with an articulable and individualized suspicion to detain that person while the warrant is being executed. Id. at 702-05.

        Unlike the owner of the residence in Summers, who was descending the front steps when the police encountered him, Mr. Maddox was confronted by the police as he was parking his car on street in the neighborhood. The distance from where Mr. Maddox was parking his car to 5025 Sheriff Road, N.E. was never established at the evidentiary hearing. Nevertheless, even if it is assumed for the sake of argument that the rule announced in Summers would apply to justify the seizure of Mr. Maddox at whatever distance he was from 5025 Sheriff Road, N.E., his seizure still cannot be justified under Summers. Summers only holds that the existence of the search warrant gives the police an articulable suspicion for a temporary detention. Summers, 452 U.S. at 703-05. Summers does not permit a full-blown arrest requiring probable cause. Here, however, the seizure of Mr. Maddox was a full-blown arrest. At the very latest, it became such an arrest when Detective Copeland went into Mr. Maddox's pocket and took out his keys. Holmes v. United States, 505 F.3d 1288, 1292-93 (D.C. Cir. 2007) (seizure of keys from inside defendant's pocket exceeded the scope of a Terry stop, and seizure was illegal because there was no probable cause). Accordingly, the existence of the search warrant

for 5025 Sheriff Road, N.E. cannot be used to justify the detention of Mr. Maddox that occurred here.

Since Mr. Maddox's seizure was illegal, all evidence obtained as fruits of that seizure must be suppressed. Wong Sun v. United States, 371 U.S. 471, 487-88 (1963). Obviously, the fruits of Mr. Maddox's seizure would include all evidence allegedly recovered from his person and any statements he may have made. Moreover, the fruits of his illegal seizure would also include the evidence recovered pursuant to the search of the car. Indeed, Mr. Maddox's seizure was effected, in part, by blocking his car and taking his keys away from him after he exited it. At the time that Mr. Maddox was seized, there was nothing to give the police even a reasonable suspicion that the car contained contraband or was otherwise actively involved in illegal activity. If Mr. Maddox had not been illegally seized, he could have removed his car from the scene before the car was examined and exposed to the drug-detection dog. If Mr. Maddox had driven his car off, the police would have never developed any grounds for searching the car in the first place. For this reason, the search of the car was "come at by exploitation" of Mr. Maddox's illegal seizure, and all evidence recovered from the car must be suppressed as fruits of that illegal seizure. See id.

## B. Illegal Execution of the Warrant

Even if for some reason it is found that, under Summers, the existence of the search warrant would have permitted the type of seizure of Mr. Maddox that occurred here, Mr. Maddox's seizure still must be found to be illegal because the police improperly waited for Mr. Maddox to be present before they executed the warrant. Here,

even before they went to execute the search warrant, the police had planned all along to seize Mr. Maddox so that they might catch him with drugs on his person.  Moreover, it seems that, even before Detective Copeland applied for the search warrant, the police had sufficient probable cause for getting a warrant for Mr. Maddox's arrest.  Among other things, Detective Copeland claims that, during the month before he applied for the search warrant, his reliable confidential informant was routinely telling him that he was actively witnessing Mr. Maddox selling drugs while armed "pretty much every day." Furthermore, the Detective claims that, on at least three separate occasions during the month before he applied for the warrant, he had personally observed Mr. Maddox engaging in numerous hand-to-hand transactions with people on the street wherein Mr. Maddox would give a person a small object and receive money in return.  On every occasion that the Detective observed Mr. Maddox, Mr. Maddox was conducting these hand-to-hand transactions in a known open-air drug market at a time that is associated with the sale of heroin.  In addition, since the Detective obviously had time to get the search warrant, he had adequate time to get an arrest warrant as well.  Nevertheless, instead of getting a warrant for Mr. Maddox's arrest, the police instead made a plan to effect a warrantless seizure of Mr. Maddox by waiting until he was present at the scene before they executed the warrant so that they could seize him under the color of that warrant.  The Fourth Amendment, however, does not permit the police to manufacture the circumstances that would otherwise permit a warrantless seizure in order to get around the warrant requirement.

In Coolidge v. New Hampshire, 403 U.S. 443 (1971), the police executed a search warrant for a car belonging to the defendant.  The car was seized and later searched, and

evidence implicating the defendant in a homicide was found in the car.  Id. at 446-48.
The Supreme Court concluded that the search warrant for the car was invalid, id. at 453,
and the Court therefore went on to decide whether or not there were any grounds that
would support the seizure and search of the car in the absence of a valid warrant, id. at
453-484.  One of the arguments that the State was putting forward was that the car was a
known instrumentality of a crime which was in plain view and that the police could
therefore lawfully seize and search the car under the plain-view exception to the warrant
requirement.  Id. at 464.  The Supreme Court, however, ruled that, even if the car was
evidence in plain view, the seizure and search of the car still could not be justified
because the police did not "inadvertently" come across the car.  Rather, the police went to
the location knowing where the car was an intending to seize it.  Id. at 469-70.
Characterizing the seizure of the car as a "planned warrantless seizure," the Court ruled
that, even if the car was evidence in plain view, the seizure and search of the car was
unconstitutional because the police knew the location of the car, had ample time to get a
warrant, and went to the location with the intent to seize it.  Id. at 472 & n.2.

The situation involving the seizure of Mr. Maddox is qualitatively no different
than the situation involving the seizure of the car in Coolidge.  Though here the
government is relying not on the plain view doctrine but rather on the rule announced in
Summers permitting certain seizures of persons during the execution of a search warrant,
the fact remains that the government—just like the State in Coolidge—is still relying on a
exigency excusing non-compliance with the warrant requirement to justify a "planned
warrantless seizure."  Moreover, just as the police in Coolidge had ample to time to get a
warrant for the car, the police here had ample time to get a warrant for Mr. Maddox.

17

Finally, the police here, like the police in Coolidge, created by their own actions the circumstances which they later claimed provided the exigency allowing them to dispense with the warrant requirement.  However, "'[e]xigent circumstances' do not excuse the failure to secure a warrant when those circumstances are created by government officials who unreasonably delay or avoid obtaining the warrant."  United States v. Rengifo, 858 F.2d 800, 804 (1st Cir. 1988).  Accordingly, just as the seizure of the car in Coolidge violated the warrant requirement, so too did the seizure of Mr. Maddox here.  See also United States v. Jones, 239 F.2d 716,719 (5th Cir. 2001) ("the exigencies supporting a warrantless seizure may not… consist of the likely consequences of the government's own action").

In reaching its ruling in Coolidge, the Court considered a hypothetical wherein the police have a search warrant that fails to mention a particular item which the police know is present and intend to seize.  The Court stated that executing the warrant in order to be able to find the item and then seize it because it is plain view would be an impermissible circumvention of the warrant requirement.  Coolidge, 403 U.S. at 471.  The conduct at issue here is nearly identical to the conduct that the Court declared would be unconstitutional in Coolidge, for here the police also intentionally used the existence of a warrant to justify a planned seizure that is outside the scope of the warrant.  The situation here is also comparable with the situation in United States v. Munoz-Guerra, 788 F.2d 295 (5th Cir. 1986).  In Munoz-Guerra, the police went to a house and looked in a window, seeing certain contraband.  At this point, the police knocked on the door, and the defendant came to the door.  However, the defendant stated to the police that, before he could let them in, he had to go and get a key for the door.  Fearing that the defendant

might be going to destroy evidence or get a weapon, the police forcefully entered the residence. Id. at 296-97. The Fifth Circuit held that this warrantless entry was illegal. Id. at 298. The court noted that, while the existence of contraband inside a premises when coupled with the occupants' awareness of the police outside is an exigency that justifies dispensing with the warrant requirement, the "government [can]not justify a warrantless search on the basis of exigent circumstances of its own making." Id. at 298. The court noted that, once the police saw the contraband through the window they could have gotten a search warrant. Thus, it was improper for the police to knock on the door and thereby circumvent the warrant requirement by manufacturing the circumstances that they then claimed excused them from that requirement. Id.

It should be pointed out at this point that, in saying that the rule announced in Summers permitting warrantless seizures of persons during the execution of a search warrant cannot be used to justify his seizure, Mr. Maddox is saying that it was improper for the police to orchestrate events so that he would be present during the execution of the search warrant so that they could then seize him pursuant to the Summers rule. Just as it was illegal for the police to knock on the door in Munoz-Guerra, it was illegal for the police here to wait until Mr. Maddox was present before executing the warrant. Though Mr. Maddox's seizure was illegal, the fundamental illegality is not that the Summers rule was simply inapplicable but rather that the police manufactured the circumstances to bring the Summers rule into play. Accordingly, all evidence recovered as an exploitation of this fundamental illegality must be suppressed. This would obviously include any evidence recovered from Mr. Maddox's person and any statements made by Mr. Maddox. Moreover, it would also include any evidence recovered from Mr. Maddox's car, as the

car would not have even been present to be searched had the police not waited for Mr.

Maddox to arrive in it before executing the search warrant.  It should also be emphasized

that the search of the car was itself a fruit of Mr. Maddox's seizure, see supra at 15, a

seizure that was illegal because, among other things, the police effected it by

orchestrating events to get around the warrant requirement.

### C.  Illegal Seizure of the Car

When the police seized Mr. Maddox, they also seized his car.  Here, Detective

Copeland drove up to Mr. Maddox as Mr. Maddox was parking his car and blocked Mr.

Maddox's car in with the Detective's own car.  When Mr. Maddox exited the vehicle, the

Detective confronted him, patted him down for weapons, and took his keys from out of

his pocket.  The Detective then, with seven or eight other officers, removed Mr. Maddox

from the presence of the car, leaving several other police officers stationed with the car to

await the arrival of the drug-detection dog.  The Supreme Court has stated that "[a]

'seizure' of property occurs when there is some meaningful interference with an

individual's possessory interests in that property."  United States v. Jacobsen, 466 U.S.

109, 113 (1984).  In Jacobsen, the Court went on to note that, for the purposes of the

Fourth Amendment, the determination as to whether or not there is a seizure of property

is to be made much in the same way as a determination as to whether or not there is a

seizure of person—that is, by looking to see if there has been a "meaningful interference,

however brief, with… freedom of movement."  Id. at 113 n.5.

Here, it cannot credibly be claimed that the police would have let anyone enter or

move the car once they seized Mr. Maddox.  Indeed, the police had a canine unit on

standby to examine the car even before the car appeared on the scene, and after Mr.

Maddox was removed from the scene, several police officers remained stationed with the

car to await the arrival of the unit.  Moreover, the car was blocked by Detective

Copeland's car.  Also, the police had taken possession of Mr. Maddox's keys.  It is

therefore hard to see how Mr. Maddox's possessory interest in the car was not being

interfered with and how his ability to use that car (or permit others to use that car) was

not being restricted.  Accordingly, it must be acknowledged that the car was seized.

At the time that the car was seized, the police had not developed even a

reasonable suspicion that the car might contain contraband or otherwise be actively

involved in illegal activities.  At the time that the car was first seized, Sergeant Neill

could not have yet seen the empty green Ziploc that he says he saw in the cup holder.

Moreover, as stated earlier, it is not at all clear that the observation of an empty Ziploc,

without more, would provide even sufficient grounds for a Terry stop anyway.  See supra

at 13 n.1.  Additionally, the alert that the drug-detection dog made on the car was also a

post-seizure event.  Thus, the seizure of the car was illegal, and all items recovered

pursuant to the illegal seizure must be suppressed.  This of course would include, among

other things, the drugs that were allegedly found in the passenger compartment and the

gun that was allegedly found in the trunk.

### D.  Invalid Search Warrant

In the Affidavit, there are only three assertions that connect Mr. Maddox to 5025

Sheriff Road, N.E. and thereby provide any possible grounds for finding probable cause

to search that location.  First, in the Affidavit, Detective Copeland states that, "[t]hrough

other police investigative techniques I have acquired other information indicating that Maddox regularly uses 5025 Sheriff Road, N.E. as a base of operations before going out to sell heroin each morning."  Second, the Detective states, "I have learned that another resident of the house at 5025 Sheriff Road, N.E., is Mr. Maddox's close family member." Finally, Detective Copeland states that, on at last three occasions, he has seen a car that he associates with Mr. Maddox "parked at this address [5025 Sheriff Road, N.E.]." According to the Affidavit, the reason Detective Copeland associates the car that he saw "parked at" 5025 Sheriff Road, N.E. with Mr. Maddox is because he had learned that Mr. Maddox was stopped while driving that car on June 6, 2007.  Nothing else in the Affidavit provides any reason for believing that the car the Detective saw "parked at" 5025 Sheriff Road, N.E. has any connection to Mr. Maddox.  The Detective further states in the Affidavit that, during the stop of the car that Mr. Maddox was driving on June 6, 2007, some heroin was found in close proximity to where the car was stopped.  The Detective also claims that he checked the police records and determined that the car was registered to Mr. Maddox.

As it turns out now, of course, all of the statements just cited from the Affidavit regarding the car turn out to be false.  First, Mr. Maddox was never seen driving the car involved in the events of June 6, 2007.  Second, no drugs were ever found near the car— or any other else for that matter.  Third, the car was not in fact registered to Mr. Maddox but to someone else altogether.  Moreover, as it turns out, the Detective never actually saw the car he associated with Mr. Maddox "parked at" the address 5025 Sheriff Road, N.E.  During the evidentiary hearing, the Detective admitted that he had only seen the car parked on the public streets in the vicinity of the residence under circumstances that

would no more connect the car to 5025 Sheriff Road, N.E. than it would to any other residence in the area.  Finally and most importantly, during the evidentiary hearing on the Motion to Suppress, the Detective admitted that the car involved in the events of June 6, 2007 was not even the same car that he saw "parked at" 5025 Sheriff Road, N.E.  Thus, as it turns out, the car which Mr. Maddox was not actually driving on June 6, 2007, which was not actually registered to him, and near which no drugs were ever actually found, was not even the same car that Detective Copeland did not actually see "parked at" 5025 Sheriff Road, N.E. in the first place.

Under Franks v. Delaware, 438 U.S. 154 (1978), false statements in affidavits for search warrants which are made intentionally or in reckless disregard of the truth must be purged from the affidavit.  If "with the false material set to one side, the affidavit's remaining content is insufficient to establish probable cause, the search warrant must be voided and the fruits of the search excluded to the same extent as if probable cause was lacking on the face of the affidavit."  Id. at 156.  In the instant matter, there are only three explanations for why Detective Copeland put the false information regarding the car (or as it turns out "cars") into the Affidavit.  The first explanation is that the Detective had no facts relevant to his assertions about the car(s) but nevertheless swore to those assertions any way.  The second explanation is that the Detective did have truthful facts relevant to his assertions but deliberately swore to entirely contrary assertions notwithstanding that. The third explanation is that the Detective had truthful facts relevant to his assertions but failed to even consult those facts before making his assertions.  Obviously, if either of the first two explanations is true, then the false statements in the Affidavit regarding the car would have to have been made deliberately.  Additionally, even if the third explanation is

true it is hard to see how it is anything but reckless for Detective Copeland to make assertions under oath without having consulted his information to see if the assertions were in fact true.

At the evidentiary hearing on the Motion to Suppress, Detective Copeland stated both that he had all the correct information about the cars before him when he swore out the Affidavit and that he did not swear to the false information with any bad intent. The Detective claimed that the fact that he swore to the false information was a simple mistake. However, if the Detective did have the correct information before him when he swore out the Affidavit, he must have utterly failed to review that information before making the sworn assertions in the Affidavit—especially given that the information that was sworn to was entirely at odds with the truthful information in almost every way. It is submitted that when a person makes assertions without even bothering to consult his information and see if his assertions are true, he is by definition engaging in reckless conduct. In such a circumstance, it cannot be credibly claimed that the person was not disregarding an obvious and substantial risk that what he was asserting might turn out to be false. This seems particularly true when, as here, the person is making the assertions in a context where he is under oath and where the need for truthfulness and accuracy is paramount. Accordingly, the false statements that Detective Copeland made in the Affidavit regarding the car must be found to have at least been recklessly made. See United States v. McKey, Slip Copy, 2007 WL2601206 at 5 (E.D. Ark. 2007) (where affiant only "skimmed" for mistakes an affidavit that attorney prepared for affiant based on attorney's interview with affiant, misrepresentations that found their way into affidavit were made in reckless disregard of the truth).

Since the false statements regarding the car that Detective Copeland swore to in the Affidavit were made in at least reckless disregard of the truth, those statements must be purged from the Affidavit.  Once those statements are removed from the Affidavit, the only other assertions connecting Mr. Maddox with 5025 Sheriff Road, N.E. are Detective Copeland's statements 1) that he has, "[t]hrough other police investigative techniques, …acquired other information indicating that Maddox regularly uses 5025 Sheriff Road, N.E. as a base of operations before going out to sell heroin each morning" and 2) that he has "learned that another resident of the house at 5025 Sheriff Road, N.E., is Mr. Maddox's close family member."   However, regarding the first assertion, the Detective does not in any way explain what these "other police investigative techniques" were, nor does he say what "information" he developed through the use if these investigative techniques or how that information supports the conclusion that Mr. Maddox does in fact use 5025 Sheriff Road, N.E. as a base of operations for his alleged drug-dealing activities.  Regarding, the second statement, the Detective does not explain how he learned that a family member of Mr. Maddox resides at 5025 Sheriff Road, N.E.  Thus, in both instances, the statements are conclusory assertions for which no independent determination of reliability can be made.

Conclusory statements in an affidavit by a police officer that do not supply sufficient information for a judicial officer to make an independent determination regarding their reliability cannot be used to support a finding of probable cause. Whiteley v. Warden, 401 U.S. 560, 564-65 (1971).  Indeed, as this Court itself has stated, where there are no facts to show the currency, reliability, and source of the information contained in an affidavit, not only is the affidavit insufficient to support a finding of

probable cause but also is the affidavit so lacking that even police officers cannot reasonably claim that they believe the affidavit contains "sufficient indicia of probable cause" in order to avail themselves of the <u>Leon</u> "good faith" exception.  <u>United States v. Johnson</u>, 332 F.Supp.2d 35, 41-41 (D.D.C. 2004) (Friedman, J.).  Thus, the statements in the Affidavit regarding the fact that Detective Copeland had, through "other police investigative techniques," developed "information" showing that Mr. Maddox uses 5025 Sheriff Road, N.E. as a base of operations for his drug-dealing activities and regarding the fact that Detective Copeland had determined that a relative of Mr. Maddox resides at the address cannot be referenced to salvage the Affidavit after the removal of the false statements regarding the car.[2]  Since there are no other assertions in the Affidavit connecting Mr. Maddox's alleged illegal activities to 5025 Sheriff Road, N.E., the Affidavit, after the false statements regarding the car are removed, fails to make out probable cause for a search of that address.[3]

Because the Affidavit fails to make out probable cause to search 5025 Sheriff road, N.E. after the false statements regarding the car are removed, all evidence recovered pursuant to the execution of the resulting warrant must be suppressed.  This

---

[2] Even if the statement regarding the fact that a relative of Mr. Maddox resides at 5025 Sheriff Road, N.E. had been shown to be supported by information from which a judicial officer could have made an independent determination as to the reliability of the statement, it would still mean little here.  It is submitted that the mere fact that a relative of someone who is believed to be engaged in criminal activity resides at a particular location cannot supply probable cause to search that location.

[3] Even if it could be found that Detective Copeland had true information that would have established probable cause for the search of the address had he disclosed it in the Affidavit, such a finding would not salvage the Affidavit.  "An otherwise insufficient affidavit cannot be rehabilitated by testimony concerning information possessed by the affiant when he sought the warrant but not disclosed to the issuing magistrate."  <u>Whiteley v. Warden</u>, 401 U.S. 560, 565 n.8 (1971).  "It is elementary that in passing on the validity of a warrant, the reviewing court may consider only information brought to the magistrate's attention."  <u>Aguilar v. Texas</u>, 378 U.S. 108, 109 n.1 (1964).  Where there is a <u>Franks</u> violation, "'[t]he fact that probable cause did exist and could have been established by a truthful affidavit does not cure the error.'"  <u>United States v. McCain</u>, 271 F.Supp.2d 1187, 1193 (N.D. Cal. 2003) (<u>quoting</u> <u>United States v. Davis</u>, 714 F.2d 896, 899 (9th Cir. 1983).

obviously includes all evidence recovered in the house and all statements made by Mr. Maddox in the house.  Moreover, because the warrant was invalid, Mr. Maddox's seizure pursuant to the execution of the warrant was also invalid, and all evidence recovered from Mr. Maddox's person and all statements made by him would also have to be suppressed.  Finally, since the search of Mr. Maddox's car was come out by exploitation of Mr. Maddox's seizure, see supra at 15, all evidence recovered from the car would have to be suppressed as well.

It should be pointed out at this point that the "good faith" exception created in Leon v. United States, 468 U.S. 897 (1984) cannot be used in an attempt to rescue the search of the 5025 Sheriff Road, N.E. that occurred here.  "Under Leon, a Franks violation is not excused."  United States v. Jacobs, 986 F.2d 1231, 1235 (8th Cir. 1993) (citing Leon, 486 U.S. at 914 n.12). "The Leon good faith exception does not apply to search warrants granted on the basis of a recklessly or intentionally false affidavit that violates Franks."  United State v. Orr, 864 F.2d 1505, 1508 n.3 (10th Cir. 1988) (citing Leon 468 U.S at 923).  Indeed, Leon makes clear that, notwithstanding the "good faith" exception it establishes, "[s]uppression… remains an appropriate remedy if the magistrate or judge in issuing the warrant was misled by information in an affidavit that the affiant knew was false or would have known was false except for his reckless disregard of the truth."  Leon, 468 U.S. at 923 (citing Franks, 438 U.S. 154).  Moreover, the Court in Leon expressly quotes Franks with approval, saying, "'[I]t would be an unthinkable imposition upon [the magistrate's] authority if a warrant affidavit, revealed

after the fact to contain a deliberately or recklessly false statement, were to stand beyond impeachment.'" Leon, 468 U.S. at 914 n.12 (quoting Franks, 438 U.S. at 165).[4]

## **CONCLUSION**

WHEREFORE, the defendant, Edward Maddox, maintains that, in relation to the search of 5025 Sheriff Road, N.E. that occurred on September 29, 2007, the following should be suppressed under the fourth Amendment:

1.      all evidence recovered from 5025 Sheriff Road, N.E.,

2.      all evidence recovered from Mr. Maddox's person and all statements made by him after his seizure, and

3.      all evidence recovered from Mr. Maddox's car.

Respectfully submitted,

_____/s/_____
Jerry Ray Smith
Counsel for Edward Maddox
717 D Street, N.W.
Suite 400
Washington, D.C. 20004

---

[4] Courts have pointed out that Leon and Franks really address two different situations: Franks applies to those situations where the affidavit is defective due to error on the part of the police, whereas Leon applies to those situations where the search warrant is defective due to an error on the part of the magistrate. State v. Rufus, 993 S.W.2d 490, 498 (Ark. 1999); see also People v. Maestas, 204 Cal.App.3d 1208, 1216 (Cal. App., 1st Dist 1988).

## AFFIDAVIT IN SUPPORT OF AN APPLICATION FOR A SEARCH WARRANT

I, Detective, Kevin Copeland of the METROPOLITAN POLICE DEPARTMENT, being duly sworn, request the issuance of a Search and Seizure Warrant and state as follows:

### 1. DESCRIPTION OF THE PLACE TO BE SEARCHED:

FOR THE ENTIRE RESIDENCE AT THE ADDRESS OF 5025 SHERIFF ROAD NORTHEAST, WASHINGTON , D.C., WHICH IS DESCRIBED AS A TWO-STORY, RED BRICK TOWN-HOUSE. THE NUMERALS "5025" IS AFFIXED TO THE RIGHT OF THE DOOR.  THE RESIDENTIAL DOOR TO THIS LOCATION IS WHITE IN COLOR AND IS PRECEDED BY A BLACK COLORED SECURITY STYLE STORM DOOR.

This residence has been personally viewed by the Affiant.

### 2. AFFIANT'S TRAINING AND EXPERIENCE:

I have been a law enforcement officer for (19) years. I am currently a Detective assigned to the Narcotics Special Investigation Division (MPD). This affiant has narcotics and gun recovery training with the Drug Enforcement Administration and the Federal Bureau of Investigation. Your affiant has spent many hours observing the methods and habits of persons concealing hand guns and selling drugs. I have made over 20 gun arrests and 75 narcotics violations arrests in the past year and have participated in the execution of at least 100 D.C. Superior Court and U.S. District Court Search Warrants.  I have been involved in the investigation and arrest of the members of narcotics organizations that were later charged in United States Federal Courts.  I have interviewed numerous subjects involved in the sale and distribution of narcotics. Through these interviews and during these investigations and arrests, I have learned the methods utilized by narcotics traffickers.

### 3. PROBABLE CAUSE (FACTUAL BASIS) FOR WARRANT:

The facts that establish probable cause for the issuance of a Search and Seizure Warrant are as follows:

Since the beginning of September, I have been investigating the narcotic-trafficking activities of an individual named Edward Maddox, who I suspect daily sells heroin in the 600 block of Division Avenue, N.E. I personally have conducted surveillance of this man in this block of Division Avenue, N.E., on at least three different occasions.  On each occasion, I have seen a number of persons approach Maddox, give him money, and receive back objects.  This occurs out of doors on the street, at hours I associate with heroin sales.  Maddox does not have items apparently for sale that would suggest he is a vendor.  This occurs in the morning before 8:00 a.m., at a time when it largely would be too early for legitimate vendors to sell items.  Further, I know that the 600 block of Division Avenue, N.E., has been an open-air market for illegal narcotics-trafficking for at least ten years, if not considerably longer.  Further, I know that heroin sellers normally do much of their business in

-1-

the early morning hours, such as 7:00 a.m., in contrast to most cocaine sellers, who normally engage in their sales in the evening. Heroin is essentially a "morning" drug.

Further, since early September I have regularly been briefed by a confidential police informant about Maddox drug activities. The informant has direct personal knowledge of Maddox's activities, and it relays this information to me. This informant has told me that Maddox carries a black nine-millimeter semi-automatic hand gun while selling drugs on Division Avenue, N.E. My confidential informant has told me this about Maddox on the gun on several occasions, most recently this morning.

In the course of my investigation into Maddox's activities, I have consulted with other police officers, and I have learned that an MPD sergeant stopped a car being driven by Maddox on June 6, 2007. During the course of this stop, the sergeant seized about $6700 in cash from the car that Maddox was driving. MPD now is processing this case for forfeiture as the suspected proceeds of crime. Although police seized suspected heroin from near the site of the traffic stop, Maddox was not arrested because of insufficient proof that the drugs on the ground had come from him or the car he was driving.

I have learned from police records that the car in which Maddox was stopped is registered to him, as well as another person. I learned from police records the license plate number of this car. One of the reasons that I regard my confidential informant as supplying reliable intelligence about Mr. Maddox is that very soon after the police sergeant told me that she had seized more than $6700 from Mr. Maddox's car during a traffic stop, my informant called and independently relayed the same information, which indicates to me that the informant knows well what activities Mr. Maddox undertakes.

Through other police investigative techniques I have acquired other information indicating that Maddox regularly uses the town-house at 5025 Sheriff Road, N.E., as a base of operations before going out to sell heroin each morning at Division Avenue, N.E. The 5000 block of Sheriff Road, N.E., is two blocks west of where Division Avenue, N.E., and Sheriff Road, N.E., come together at Eastern Avenue, N.E. Thus, this location is extremely convenient for Mr. Maddox to use to store heroin before leaving it to go sell the drug on Division Avenue, N.E. Further, I have learned that another resident of the house at 5025 Sheriff Road, N.E., is Mr. Maddox's close family member.

To corroborate the information about Marddox's use of 5025 Sheriff Road, I have undertaken surveillance of the premises at that address. I have done this on at least three occasions. These have included observations made at early morning hours, such as 3:00 a.m. and 4:00 a.m., when I would suspect that persons in the address would be asleep. On each of those occasions, I have seen the car parked at this address in which Maddox was stopped on June 6, 2007.

Further, I have researched Mr. Maddox's criminal history, with particular regard to prior arrests involving firearms, such as my confidential informant tells me that Mr. Maddox carries.

BST

I have learned that April 9, 1996, Mr. Maddox was arrested in the 600 block of 46th Place, S.E., and charged with carrying a pistol without a license and possession with intent to distribute PCP. This led to Mr. Maddox's conviction for the federal offense of unlawful possession of a firearm by a convicted felon. Mr. Maddox has an arrest in October 1994 for carrying a pistol without a license.

Further, Mr. in 1980, Mr. Maddox was charged with an attempted armed robbery in Maryland. In 1981, Mr. Maddox was charged with a shooting in an armed robbery in Washington, D.C. In 1982, Mr. Maddox has an arrested in Maryland for assault with intent to maim. On June 13, 2001, Mr. Maddox was arrested in the 1300 block of Ridge Street, S.E., and charged with simple assault.

## 4. BACKGROUND OF CONFIDENTIAL SOURCE:

My confidential informant has provided a substantial amount of information to law enforcement. This information has proven reliable and has been corroborated by independent investigation as being accurate, whenever possible. To date, this informant has provided me accurate, reliable, and timely information, which has resulted in the issuance of another search warrant, the seizure of two handguns, and a very substantial heroin seizure of more than 400, plus $174.000.00 in U.S. Currency While co-operating with me, this confidential informant has not provided information that I have found to be incorrect or false.

## 5. JUSTIFICATION FOR THE PLACE TO BE SEARCHED AND ITEMS TO BE SEIZED

Based upon my professional police training, my experience as a police officer in making arrests for drug or gun crimes, and the training and experience of other officers with whom I work closely or spoke to in preparing this affidavit, I have learned that:

A. Gun possessors often buy, or get and keep extra bullets for their guns, beyond the number of rounds the gun will hold; and, these gunmen usually keep the extra ammunition at home;

B. Among the main reasons for this is that the smallest amount of bullets that commonly can be bought from a gun shop is a 50-round box or brick; this is a standard size bought at gun shops in jurisdictions surrounding the District of Columbia. In general, ammunition can not be bought lawfully in Washington, D.C. In my experience, almost never are bullets sold loose or individually in Washington, D.C., so almost all bullets found in a gun recovered by police originally were bought in brick or box form;

C. As very few, if any, handguns have a capacity of 50 rounds, most persons who are found with a pistol in Washington, D.C., almost certainly must have bullets kept or stored outside a gun that is being carried personally. Thus, if a person is arrested with an unregistered gun and it has fewer than 50 bullets in it, it is likely that this person has additional bullets elsewhere, most probably at home. Possession of such bullets is the crime of unlawful

RS T

possession of unregistered ammunition; further, a person and his or her family normally do not throw away bullets after an arrest on a gun charge, and thus bullets are kept in an arrested person's home much longer than 72 hours after a gun possessor's arrest;

D.  Persons who keep or carry guns illegally also usually keep items associated with their firearms long after they have bought or got the guns, including the original maker's packaging, gun-cleaning tools, and additional parts, such as gun-sights.  These are almost always stored in the gun-possessor's home.  In particular, gun-cleaning equipment, which is excellent evidence of illegal gun possession, normally is not carried on a person with a gun, but kept at home, to be used periodically to keep a gun "in shape" or good working order; further, these persons normally keep such items much longer than 72 hours after a gun possessor's arrest;

E.  That, it is quite common for a person who possesses one firearm to own or possess additional firearms, and, that it is common for a person who is found carrying a firearm to have stored at home at least one more gun, along with more bullets, and papers related to the that firearm; this is particularly so if the person who is found carrying the firearm has ties to illegal narcotic-trafficking; further, a person caught with one gun, who owns a second gun, hardly ever throws away the second gun, or bullets for it, and these persons normally keep such items much longer than 72 hours after a gun possessor's arrest;

F.  That many persons who illegally possess guns often have pictures taken of themselves or with friends in which they show guns, and that these pictures, themselves excellent evidence of illegal gun possession, commonly are kept at the gun possessor's home or in their room at their homes, along with gun paraphernalia; and,

G.  That, even after an individual's arrest for gun-related charges, the person's family and friends commonly do not get rid of other guns or bullets; and, even if they do get rid of other guns, they are much less likely to get rid of ammunition, possession of which almost always is a crime in Washington, D.C.; further, that hardly ever do such family or friends get rid of gun packaging or cleaning equipment or photographs of a person with a gun; and that such items will remain at the arrested person's home for a long time after such an arrest.

Based on my training, experience, and participation in drug-related arrests and the training and experience of other officers with whom I work closely or spoke to in preparing this affidavit, I have learned that:

A.  Most drug sellers use their homes as the main place to store what they use in their business, including drugs they are waiting to sell, records of their business, and money they have made.  Although drug sellers work in an unlawful trade, they nevertheless act similarly to small or mid-level retailers engaged in a legitimate business.  Because of the nature of the illegal business, however, drug-traffickers must hide their inventory, income, and associated papers and paraphernalia from competitors, police, and potential robbers.  Drug sellers thus

-4-

RST

like to keep their drugs, money, and business records very close to hand and to hide these things in order to keep tight control over them. Even when drug sellers have a second business place for making sales, such as a stash or safe house, they still typically keep contraband, proceeds, and evidence in their homes;

B. Like persons who engage in a lawful retail trade, illegal drug sellers make and keep papers that document their activities to keep track of their illegal business. These include records detailing the drugs they have ordered and those they have sold, as well as payments made and received, and money owed or owing. Such papers typically include accounting documents, receipts, notes, ledgers, bank records, and money orders. Drug sellers keep such papers or records close to hand for ready access such as in safe places in their homes;

C. Drug sellers often hide in these same places at home the money or goods they get from selling drugs, so that in such places typically are found large amounts of cash or other valuable items, which are the proceeds of the unlawful business;

D. Persons who sell illegal drugs commonly keep close to hand, particularly at home, the tools of their trade, that is, things used to process, cut, or cook cocaine, such as scales, razors, packaging materials, cutting agents, cooking utensils, microwave ovens, dishes and other containers for converting cocaine into cocaine base;

E. Drug sellers typically keep close to hand, particularly at home, books or papers listing the names, addresses, and/or telephone numbers of their colleagues and employees in the business. Drug sellers often use cell phones, pagers and telephone systems to contact their associates in the narcotic trade;

F. Drug sellers often take photographs of themselves, their associates, and their property and illegal contraband. They usually keep such photos at home; and,

G. Because the drug trade is illegal, cash-based, and highly profitable, drug sellers are at risk of being robbed or "muscled out" by competitors. Drug dealers associate with criminals, many of whom are prone to violence. Thus many, if not most, drug-dealers regularly carry or have close to hand guns and ammunition. They have these to protect themselves, their drugs, and their money.

## 6. DESCRIPTION OF THE ITEMS TO BE SEIZED:

In addition to controlled substances and firearms, I seek authority to search for and to seize:

a) To seize any books, records, and documents relating to the acquisition, possession, sale, transportation or distribution of firearms, ammunition, and related illegal activities.

b) To open any and all safes, locked boxes and receptacles and to seize all contents which pertain to the acquisition, possession, sale, transportation or distribution of illegal controlled

substances and the related illegal activities.

c) Indicia of occupancy, residency, rental, and/or ownership of the premises described herein, including, but not limited to, utility and telephone bills, canceled envelopes, rental, purchase or lease agreements, and keys.

d) To search any and all persons found on the premises to be involved in said illegal activities.

e) To view all non-commercially produced videotapes.

f) Firearms, including but not limited to, handguns, pistols, revolvers, rifles, shotguns, machine guns, ammunition, and other weapons, which is in violation of DC Code 22-4503.

Therefore, based on the aforementioned facts and circumstances, it is your affiant's belief that probable cause exits for the issuance of a Search Warrant for the listed premise that "EDWARD MADDOX" is in possession of a 9mm handgun and that he is storing it in his home. Your affiant respectfully requests that a D.C. Superior Court Search Warrant be issued for the entire premise of "5025" Sheriff Road Northeast, Washington,, D.C.

_____ 9/28/07

Affiant's Signature Date and time

REVIEWED FOR LEGAL SUFFICIENCY _Barry Wiegand, AUSA_

AUSA

SWORN BEFORE ME IN MY PRESENCE ON _Sept 28_, 2007 at _5_ a.m. /p.m.

_____

JUDGE

Superior Court of the District of Columbia

-6-