UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

UNITED STATES OF AMERICA,       :
                                :
              v.                :       Cr. No.  07-288 (PLF)
                                :
EDWARD MADDOX,                  :
         Defendant.             :

GOVERNMENT'S SUPPLEMENTAL, POST-HEARING BRIEF IN
OPPOSITION TO DEFENDANT'S MOTION TO SUPPRESS
EVIDENCE, STATEMENTS AND OTHER INFORMATION

The United States, by and through its attorney, the United States Attorney for the District of

Columbia, respectfully submits this supplemental brief in opposition to defendant Edward Maddox's

motion to suppress evidence, statements, and other information.  In support of this brief, the United

States relies on the testimony provided at the March 26, 2008 hearing on the defendant's motion, as

well as the following points and authorities and such other points and authorities as may be cited at

any other hearing regarding the defendant's motion:

Defendant's Current Charges

In this case, defendant was originally charged with the following four counts: 1) Unlawful

Possession with Intent to Distribute Heroin, 2) Unlawful Possession with Intent to Distribute

Cannabis, 3) Using, Carrying and Possessing a Firearm During a Drug Trafficking Offense, and 4)

Unlawful Possession of a Firearm and Ammunition by a Person Convicted of a Crime Punishable

by Imprisonment for a Term Exceeding One Year.

Background

I.       The Investigation Of The Defendant's Activities

Metropolitan Police Department (MPD) Detective Kevin Copeland, who has been a law

enforcement officer for 19 years and has been actively involved in narcotics and gun-related

investigations as a detective currently assigned to the Narcotics Special Investigation Division, requested the issuance of a search warrant for the premises of 5025 Sheriff Road, N.E.  Tr. 42.[1] Detective Copeland requested this warrant, as set forth in a supporting affidavit, based on his investigation of the defendant, which led him to believe that the defendant: 1) was engaged in the sale of narcotics, while armed with a gun, in the 600 block of Division Avenue, N.E., and 2) was storing items related to this illegal activity at the premises of 5025 Sheriff Road, N.E., where he was living at that time.  Aff. 2-3.[2]

As part of his investigation, Detective Copeland gathered information about the defendant through a variety of means, including: 1) his discussions with a confidential informant who had direct personal knowledge of the defendant's sale of narcotics while armed with a gun; 2) Detective Copeland's personal surveillance of the defendant's apparent hand-to-hand drug dealing activities at the 600 block of Division Avenue, N.E.; 3) Detective Copeland's discussions with other law

---

[1]  "Tr. ___" refers to the referenced page(s) of the transcript from the March 26, 2008 hearing.

[2]  "Aff. ___" refers to the referenced page(s) of the affidavit in support of the search warrant for 5025 Sheriff Road, N.E., which is attached to defendant's post-hearing brief in support of his motion to suppress evidence, statements, and other information.

enforcement officers regarding their knowledge of the defendant's suspected illegal activities;[3] and 4) Detective's Copeland's review of documents related to his criminal history. Aff. 2-3.

The referenced confidential informant had previously provided a substantial amount of useful information to law enforcement. Aff. 3. This information proved reliable and was corroborated by independent investigation as being accurate. Id. At the time Detective Copeland applied for the warrant, the confidential informant had provided him with accurate, reliable, and timely information, which resulted in the seizure of two handguns, a very substantial amount of heroin, plus approximately $174,000. Aff. 3, Tr. 45-46. This seizure occurred "four or five years ago." Tr. 45, 49-98. While cooperating with Detective Copeland, this confidential informant did not provide information which Detective Copeland found to be incorrect or false or which Detective Copeland felt undercut his reliability.[4] Tr. 49, 52-53.

Detective Copeland further explained that, when the confidential informant told him that the defendant sells drugs and carries a pistol, the informant relied on his own personal observations. Tr. 43, 54, 81. Detective also clarified that, in the month prior to applying for the search warrant, he

---

[3] In his affidavit, Detective Copeland stated that, through consultation with other law enforcement officers, he learned that $6,700 in cash was recovered from a car associated with Mr. Maddox and this cash was seized for civil forfeiture as suspected proceeds of a crime. Aff. 2, Tr. 59. Detective Copeland also stated that suspected heroin was found on the ground near to the defendant, however, the defendant was not arrested. Tr. 86. At the hearing, Detective Copeland clarified that, subsequent to the issuance of the warrant and in preparation for the hearing in this case, he learned that the seizure of the $6,700 in cash occurred on June 6, 2007, but the recovery of the illegal drugs near to the defendant occurred on another date. Tr. 86, 91. Detective Copeland also clarified that he subsequently learned that the $6,700 was recovered from a car which the defendant was not seen driving – but he did have the keys in his possession, and that car was not registered in the defendant's name. Tr. 85, 87-88, 91-93.

[4] Detective Copeland explained that, since the referenced seizure four or five years ago, the informant has continued to provide information to him, but Detective Copeland did not follow-up on that information and could not express an opinion on its reliability. Tr. 49, 99.

spoke with the confidential informant two or three times a week. Tr. 54. During these conversations, the informant told Detective Copeland that he personally witnessed the defendant selling drugs while armed with a pistol "[p]retty much everyday." Tr. 81-82.

In addition, Detective Copeland explained that he had personally watched the defendant engaging in apparent drug-dealing activities at the known open-air drug market at the 600 block of Division Avenue, N.E., and these activities consisted of numerous hand-to-hand transactions in which objects were exchanged for money. Tr. 80. Detective Copeland also testified that he had personally seen the defendant driving a burgundy Chevrolet with Maryland tags, and that car is registered to him, as well as another person. Tr. 56, 58-59, 77, 88, 96-97. Detective Copeland further stated that he had information regarding the defendant transporting and selling drugs using the burgundy Chevrolet. Tr. 97-98.

On September 28, 2007, Senior Judge Robert S. Tignor of the Superior Court of the District of Columbia signed the warrant presented by Detective Copeland for the search of 5025 Sheriff Road, N.E.

II.    The Search Of The Defendant's Car, The Residence And The Defendant

On September 29, 2007, at approximately 7:00 a.m., MPD officers waited for the defendant to arrive near 5025 Sheriff Road, N.E., prior to executing the search warrant on the residence. Tr. 38. Detective Copeland explained that the officers waited for the defendant's arrival because "we knew that he had been carrying a weapon so we wanted to make sure that no one got hurt" and "to catch him with drugs on him that morning." Tr. 71, 74, 100, 104-05. That time of the morning was consistent with when the defendant would be actively engaged in his alleged drug-distribution activities. Tr. 70, 74, 99-100. When MPD officers observed the defendant parking his car near 5025

Sherriff Road, N.E., on the public street, they relayed this information to Detective Copeland. Tr. 71. Detective Copeland then approached the defendant, who was already outside the Burgundy Chevrolet, and stopped him. Tr. 71-72, 77, 100-101. Detective Copeland identified himself and explained that the police were there to execute a search warrant. Tr. 72, 101. Detective Copeland also patted down Mr. Maddox for weapons, placed him in handcuffs, and removed his keys from his pocket. Tr. 72, 102. Detective Copeland and other officers shortly thereafter escorted Mr. Maddox from the car to 5025 Sheriff Road, N.E. Tr. 101.

A.    Search Of The Defendant's Car

Looking in the window, in plain view inside the car near the center console, Sgt. Gerald Neill saw a small, empty plastic bag, which was consistent with the type of bag used to package illegal narcotics. Tr. 31-32, 37-38, 40.[5] Detective Thomas Sydnor, a 10 year veteran of MPD's Canine Unit who was part of the team assembled to assist with the execution of the search warrant and was stationed nearby, was called to the scene to help investigate the car using his drug-detecting dog "Cigi." Tr. 5, 11, 19.[6]

Cigi was specially and continually trained to detect the presence of certain drugs, namely heroin, cocaine and marijuana. Tr. 5-10. Detective Sydnor worked with Cigi on a daily basis, and took Cigi home with him when he was not on duty. Tr. 7. Detective Sydnor testified that he began working with Cigi about 12 months prior to the March 26, 2008 hearing on the defendant's motion. Tr. 7-8. Detective Sydnor has known Cigi to be reliable in his skills as a detection dog – both in training and in real-life situations. Tr. 8. During training recertification exercises conducted

---

[5] Sgt. Neill testified that he is a 29-year MPD veteran, who has been involved in "well over a thousand" narcotics-related arrests. Tr. 28.

[6] Prior to joining the Canine Unit, Detective Sydnor explained that he was a MPD narcotics detective. Tr. 5.

approximately every six weeks, Cigi has completed the exercises successfully and has never made a false alert. Tr. 8. In addition, prior to September 29, 2007, Cigi made positive alerts where contraband was recovered on two occasions in real-life situations. Tr. 8. Moreover, Detective Sydnor consulted with the MPD canine trainer who recertifies Cigi on a six-week basis, and this trainer said that, during the years preceding Detective Sydnor's work with the dog, Cigi was similarly reliable and did not make any false alerts as an MPD narcotics-detecting dog. Tr. 10. Detective Sydnor also explained that Cigi makes an alert to the presence of suspected contraband by biting and scratching it.

Once Detective Sydnor received the call for his assistance, he responded to the scene, where he saw the defendant's car parked on a public street. Tr. 11, 19. Sgt. Neill was near the car, and requested Detective Sydnor to walk Cigi around the outside of the car. Tr. 12. When Detective Sydnor began to walk Cigi down the driver's side of the car, Cigi made a very strong alert at the front driver's side wheel well, which Detective Sydnor knew as an indicator that narcotics were present inside the car. Tr. 13, 30. Based on training and experience, Detective Sydnor believed that the narcotics could have been anywhere in the car, including the passenger compartment and the trunk. Tr. 14, 22-23. Detective Sydnor told this information to Sgt. Neill, and then put Cigi back in Detective Sydnor's car. Tr. 16-17, 24. Cigi did not search inside the defendant's car. Tr. 12, 17.

After receiving this information, officers then opened the car, for the first time, and began to search it. Tr. 33. The inside of the car was not searched until Cigi alerted to the presence of narcotics. Tr. 31, 73, 107-08. Inside the car, officers recovered various items, including: 1) ziplock bags of a white powder substance, which field-tested positive for opiates, on the floorboard of the passenger compartment of the car, 2) a handgun in the trunk of the car, and 3) various paperwork. Tr. 33-36, 38, Defendant's Exhibit 2 (seizing list of car).

B.    Search Of The Residence

Inside the residence at 5025 Sheriff Road, N.E., additional officers executed the search warrant and recovered various items, including: 1) in one of the two bedrooms (to be referred to as bedroom #1), seven green ziplock bags containing a white powder substance, and this substance field-tested positive for heroin, 2) also in bedroom #1, $2,346.00 in U.S. Currency and tally sheets, 3) in one of two hall closets (to be referred to as closet #1), drug paraphernalia and one plastic bag containing a brownish powder substance weighing approximately 123 grams, and this substance field-tested positive for opiates, 4) in another hall closet (to be referred to as closet #2), two scales and several clear plastic bags containing a white powder substance weighing approximately 150 grams, and this substance field-tested positive for opiates, 5) also in hall closet #2, a sandwich bag containing a green weed substance weighing approximately 16 grams , and this substance field-test positive for the presence of THC; 6) in a closet in bedroom #2, a surgical mask and scale and 7) documents and mail matter in the name of the defendant. See Tr. 75-76; Government's Exhibit 7 (seizure list); Government Exhibit 8 (photograph and recovered items).

C.    Search Of The Defendant And The Defendant's Statement

Following the defendant's arrest on the scene, the officers recovered from the defendant: 1) $500 in U.S. currency from his left pants pocket and 2) two cellular phones from his right front pants pocket.  In addition, the defendant spontaneously told officers on the scene that the items recovered from the residence belonged to him and that none of those items belonged to his nephew, who was also in the house at the time of the search.  Tr. 105–06.

ARGUMENT

I.    The Government Does Not Intend To Introduce At Trial Any Physical Evidence or Statements Obtained From The Residence During the Execution of The Warrant And, Accordingly, The Issue Of the Warrant's Validity Is Rendered Moot

Upon further review, the Government does not intend to introduce at trial any physical evidence or statements obtained during the execution of the warrant at the residence located at 5025 Sheriff Road, N.E., on September 29, 2007.  The Government will dismiss the counts of the indictment relating to that evidence and proceed only on charges relating to the contraband recovered from the search of the defendant's car on that day.  As discussed in detail below, the Government submits that the evidence recovered from the car was properly obtained independent and regardless of the validity of the warrant.  Accordingly, the issue of the warrant's validity is rendered moot and does not need to be addressed by the Court.

The evidence recovered from the car includes: 1) eight black ziplock bags of a white powder substance, which a DEA analysis has determined to be heroin hydrochloride, and 2) a Smith & Wesson 40 caliber pistol, loaded with one round of ammunition in the chamber and 7 rounds in the magazine.  Accordingly, the Government intends to proceed on Count 1 of the Indictment on the lesser-included charge of Possession of Heroin, and on Count 4 of the Indictment on the charge of Unlawful Possession of a Firearm and Ammunition by a Person Convicted of a Crime Punishable by Imprisonment for a Term Exceeding One Year.  The Government will dismiss all other remaining charges in the Indictment which include: 1) the remaining and greater charge in Count 1 of Unlawful Possession with Intent to Distribute Heroin, 2) the entirety of the charge in Count 2 of Unlawful Possession with Intent to Distribute Cannabis, and 3) the entirety of the charge in Count 3 of Using, Carrying and Possessing a Firearm During a Drug Trafficking Offense.

II.     Independent of the Search Warrant's Validity, The Search of the Defendant's Car Was Proper

Law enforcement officers properly searched the defendant's car based on probable cause generated independent of the search warrant after a trained, reliable police dog alerted the officers to the scent of contraband inside the car.  In addition, the limited detention of the defendant during the protective sweep and subsequent search of the car did not undermine the search's validity.

Moreover, the search of the car was alternatively justified, independent of the search warrant's validity, as a search incident to the defendant's arrest.  As discussed below, the defendant apparently concedes, in his post-hearing brief at page 16, that the officers had probable cause to arrest the defendant, prior to arriving on the scene, based on Detective Copeland's investigation regarding the defendant's armed drug dealing activities.  Because the defendant's arrest took place soon after the search of the car in this case, it was authorized by the search-incident-to-arrest exception, and it is of no significance that the search of the car came before the actual arrest.

Furthermore, assuming for purposes of the defendant's motion that the officers somehow improperly relied on the warrant to search the house, any such impropriety could not justify the suppression of the items recovered from the car.  There were proper grounds to support the search of the car independent of the warrant's validity, and the search of the car did not bear a sufficiently close relationship to the search of the house to justify suppression.

A.     Law Enforcement Officers Properly Searched The Defendant's Car Following An Alert To The Scent Of Contraband By A Trained, Reliable Narcotics-Detecting Police Dog

Detective Sydnor conducted a protective sweep of the outside of the defendant's car with Cigi – a trained, reliable, narcotics-detecting police dog – and this sweep did not infringe upon the

defendant's constitutional rights. In addition, Cigi's alert to the presence of narcotics provided probable cause to believe that there was contraband in the defendant's car, and the officers then had the right to conduct a warrantless search of the entire car, where they subsequently found contraband, including eight bags of heroin and a loaded gun.

1.    The Police Dog's Alert To The Presence Of Contraband Provided Probable Cause To Search The Inside Of The Car

At the hearing, Sgt. Sydnor testified that he used Cigi to sniff the outside of the defendant's car after the defendant exited and while the car was parked on a public street. Sgt. Sydnor explained that this dog is well-trained in the search of narcotics and has provided reliable information to law enforcement officers on prior occasions. While the police dog sniffed the outside of the car, the dog alerted to the scent of narcotics inside the car. His alert therefore established probable cause to believe that there were narcotics in the defendant's car, and the inside of the defendant's car was not searched until after this alert.

The protective sweep did not infringe upon the defendant's constitutional rights. See Illinois v. Caballes, 543 U.S. 405, 409 (2005) ("the use of a well-trained narcotics detection dog – one that 'does not expose non-contraband items that otherwise would remain hidden from public view,' . . . during a lawful traffic stop, generally does not implicate legitimate privacy interests") (quoting United States v. Place, 462 U.S. 696, 707 (1983)). In Caballes, the dog sniff was performed on the exterior the driver's car while the driver was lawfully seized for a traffic violation. 543 U.S. at 409. The Court explained that "[a]ny intrusion on [the driver's] privacy expectations does not rise to the level of a constitutionally cognizable infringement." Id.

10

Courts have accepted dog sniff evidence for over one hundred years, and the defendant has not contested the ability of this evidence to establish probable cause in his filings. See, e.g., Blair v. Commonwealth, 204 S.W. 67 (Ky. Ct. App. 1918) (collecting cases). Our Court of Appeals has specifically held that the actions of a trained dog may provide probable cause for a search. United States v. Tartaglia, 864 F.2d 837, 840 & 842 (D.C. 1989) (probable cause to search train roomette when dog "scratched" at door and whined); United States v. Fulero, 498 F.2d 748, 749 (D.C. Cir. 1974) (dog's indication of narcotics established probable cause to search a foot locker). In addition, other courts have repeatedly stated that a trained dog's reaction to the scent of narcotics provides probable cause to search an automobile. See, e.g., United States v. Jeffus, 22 F.3d 554, 557 (4th Cir. 1994) ("When dog 'alerted positive' for the presence of drugs, the officer was given probable cause for the search that followed."); United States v. Seals, 987 F.2d 1102, 1106-07 (5th Cir. 1993) (dog alert gives probable cause to search vehicle).

Moreover, while the police dog's alert alone provided probable cause to search the defendant's vehicle, additional factors added to the calculus. These factors include that: 1) Sgt. Neill could see that a small empty plastic bag – consistent with the type of bag used to package narcotics – was in plain view inside the car, and 2) the defendant was believed to have recently returned from selling, while armed with a gun, narcotics on the street and the defendant could likely have used his car to store some of these narcotics or the gun. See Tr. 31-32, 37-38, 40, 71, 74,104-05. "Probable cause exists where 'the facts and circumstances within their [the arresting officers'] knowledge and of which they had reasonably trustworthy information [are] sufficient in themselves to warrant a man of reasonable caution in the belief that' an offense has been or is being committed." Draper v. United States, 358 U.S. 307, 313 (1959) (quoting Carroll v. United States, 267 U.S. 132, 162 (1925));

accord United States v. Caroline, 791 F.2d 197, 201 (D.C. Cir. 1986) ("Probable cause for a search exists where 'there is a fair probability that contraband or evidence of a crime will be found in a particular place.'") (quoting Illinois v. Gates, 462 U.S. 213, 238 (1983)).

> 2.    The Officers Properly Conducted A Warrantless Search Of The Entire Car After The Dog's Alert Established Probable Cause

Having probable cause to believe that there was contraband in the defendant's car, the officers had the right to conduct a warrantless search of the entire car, especially given Detective Sydnor's testimony that, based on his training and experience, Cigi's alert indicated that the narcotics could have been in the passenger compartment or in the trunk.  See Tr. 14, 22-23; United States v. Ross, 456 U.S. 798, 825 (1982) (police may search every part of a vehicle and container within the vehicle that may conceal the object of the search if they have a generalized belief that the vehicle contains contraband somewhere inside); United States v. Harwood, 998 F.2d 91, 97 (2nd Cir. 1993) (warrantless search of door panels permissible as LSD in blotter form can be stashed anywhere in vehicle); United States v. Bullock, 94 F.3d 896, 899 (4th Cir. 1996) (officer could forcibly remove secret compartment under back seat because he had probable cause to believe that car contained contraband); United States v. Zucco, 71 F.3d 188, 191-92 (5th Cir. 1995) (warrantless search of entire recreational vehicle including dismantling of vehicle wall permissible because probable cause to believe cocaine present); United States v. Lumpkin, 159 F.3d 983, 986 (6th Cir. 1998) (warrantless search of locked trunk and engine compartment valid because officer had probable cause to search entire vehicle for drugs); United States v. Thornton, 197 F.3d 241, 247-49 (7th Cir. 1999) (warrantless search of hidden compartment in vehicle permissible where probable cause to search vehicle existed); United States v. Sample, 136 F.3d 562, 564 (8th Cir. 1997) (warrantless search of

dashboard compartment valid because officer had probable cause to believe vehicle transporting contraband).

       3.     The Limited Detention Of The Defendant During The Protective Sweep And Subsequent Search Of The Car Did Not Undermine The Search's Validity

The limited detention of the defendant after he exited his car was supported by reasonable suspicion that he was actively engaged in criminal activities and, accordingly, the officers were authorized to conduct a limited stop of him for investigatory purposes.

       a.     The Officers Were Authorized To Conduct A Limited Stop Of The Defendant For Investigatory Purposes

Under Terry v. Ohio, 392 U. S.1 (1968), a police officer may "stop and briefly detain a person for investigative purposes," even without probable cause, when the officer has "a reasonable suspicion supported by articulable facts that criminal activity 'may be afoot,'" United States v. Sokolow, 490 U. S.1, 7 (1989) (quoting Terry, 392 U. S. at 30), or that the person "was involved in or is wanted in connection with a completed felony." United States v. Hensley, 469 U.S. 221, 229 (1985).

"Reasonable suspicion" is a "less demanding standard than probable cause and requires a showing considerably less than preponderance of the evidence." Illinois v. Wardlow, 528 U. S.119, 122 (2000). Although an officer must have more than an "inchoate and unparticularized suspicion or hunch," a valid Terry stop requires only "some minimal level of objective justification." Sokolow, 490 U. S. at 7 (internal quotation marks omitted). Accordingly, an officer may initiate a Terry stop "based not on certainty, but on the need to 'check out' a reasonable suspicion." United States v. Edmonds, 240 F.3d 55, 59 (D. C. Cir.2001) (internal quotation marks omitted); see also Cortez, 449 U. S. at 418 ("The process does not deal with hard certainties, but with probabilities. Long before

13

the law of probabilities was articulated as such, practical people formulated certain common-sense conclusions about human behavior; jurors as fact-finders are permitted to do the same-and so are law enforcement officers.").

In determining whether a Terry stop was supported by reasonable suspicion, a court examines "the totality of the circumstances -- the whole picture," Cortez, 449 U.S. at 417, and "does not separately scrutinize each factor relied upon by the officer conducting the search." Edmonds, 240 F.3d at 59. "[E]ven though a single factor might not itself be sufficiently probative of wrongdoing to give rise to a reasonable suspicion, the combination of several factors -- especially when viewed through the eyes of an experienced officer -- may." Id. at 60. The totality-of-the-circumstances test "allows officers. . . to make inferences from and deductions about the cumulative information available to them that 'might well elude an untrained person.'" United States v. Arvizu, 534 U. S.266, 273-74 (2002) (quoting Cortez, 449 U. S. at 418).

The Supreme Court has confirmed that police officers may take reasonable steps necessary to facilitate a brief investigation during a Terry stop.  See Hiibel v. Sixth Judicial District Court, 542 U. S.177, 185 (2004) ("a law enforcement officer's reasonable suspicion that a person may be involved in criminal activity permits the officer to stop the person for a brief time and take additional steps to investigate further"); Michigan v. Summers, 452 U. S.692, 700 n.12 (1981) ("'[S]everal investigative techniques . . . may be utilized effectively in the course of a Terry-type stop.'") (quoting 3 W. LaFave, Search and Seizure, § 9.2, pp.36-37 (1978)). The reasonableness of such investigative steps is also evaluated based on the totality of the circumstances. See Ohio v. Robinette, 519 U. S. 33, 39 (1996) (where defendant stopped for speeding, scope of interrogation during traffic stop evaluated for "reasonableness" "by examining the totality of the circumstances"); Place, 462 U. S.

14

at 703-04 (approving seizures of luggage "on the basis of less than probable cause, for the purpose of pursuing a limited course of investigation," after applying balancing test to evaluate reasonableness).

      b.     Reasonable Articulable Suspicion Existed In This Case To Justify A Stop Of The Defendant

That reasonable articulable suspicion existed to conduct an investigatory stop of the defendant cannot be credibly disputed by the defendant given his representations in his post-hearing brief, at page 16, that the officers actually had "probable cause" to support the defendant's arrest, even prior to their arrival to the scene. See Wardlow, 528 U.S. at 122. In his brief, he expressly states that "it seems that, even before Detective Copeland applied for the search warrant, the police had sufficient probable cause for getting a warrant for Mr. Maddox's arrest." Defendant's Post-Hearing Brief at 16.

To support this assertion, the defendant makes the following representations, at page 16 of his brief, regarding Detective Copeland's investigation: 1) "during the month before he applied for the search warrant, his reliable confidential informant was routinely telling him that he was actively witnessing Mr. Maddox selling drugs while armed 'pretty much every day," 2) "on at least three separate occasions during the month before he applied for the warrant, he had personally observed Mr. Maddox engaging in numerous hand-to-hand transactions with people on the street wherein Mr. Maddox would give a person a small object and receive money in return," 3) "[o]n every occasion that the Detective observed Mr. Maddox, Mr. Maddox was conducting these hand-to-hand transactions in a known open-air drug market at a time that it associated with the sale of heroin." Id.

      c.     The Limited Detention Did Not Exceed The Bounds Of A Reason Suspicion Detention

The officers did not exceed the established bounds for reasonable suspicion detentions during the short period of time which the protective sweep by the dog occurred. Here, the narcotics dog was on-call and near the 5000 block of Sheriff Road, N.E., at the time that the defendant arrived and was called to the scene after the defendant arrived. Tr. 11, 19. Sgt. Sydnor also testified that Cigi alerted to the presence of narcotics during the first time that he walked the dog around the car. Tr. 13, 30. Such a limited amount of time was appropriate for a reasonable suspicion detention so that the dog could be called to the scene and conduct a protective sweep of the car. See Nurse, 916 F.2d 20, 24-25 (D.C. Cir. 1990) ("The detention lasted only twenty to thirty minutes, the amount of time necessary to conduct the canine sniff, and the sniff itself appears to have been conducted diligently, notwithstanding the first dog's failure to perform properly"); United States v. Tavolacci, 895 F.2d 1423, 1427 (D.C. 1990) (finding that police acted diligently in conducting a canine sniff, where approximately fifteen minutes elapsed before dog was procured, even though officers had advance notice of suspect's arrival); see also United Sates v. Williams, 429 F.3d 767 (8th Cir. 2005) (traffic stop was not unreasonably prolonged where the wait for the drug sniffing dog was five to six minutes); United States v. Carpenter, 406 F.3d 915 (7th Cir.2005) (traffic stop not unreasonably prolonged even if it was extended by five minutes beyond the time necessary to issue a ticket for evading a red light and to conduct normal inquiries incident to such a stop).

      d.     The Officers Were Justified In Moving The Defendant From The Street To Inside The Townhouse Consistent With The Bounds Of An Investigatory Stop

The officers could properly move the defendant from the street to inside the townhouse to achieve the legitimate goals of safety and security while they investigated his armed drug dealing activity.  See Nurse, 916 F.2d at 24-25 (holding that officers' conduct in preventing defendant from getting into a taxi and escorting her back into the train terminal did not "exceed[ ] the established bounds for reasonable suspicion detentions") (citation omitted); see also United States v. Charley, 396 F.3d 1074, 1080 (9th Cir. 2005) (recognizing that "we have held that the police may move a suspect without exceeding the bounds of an investigative detention when it is a reasonable means of achieving the legitimate goals of the detention "given the specific circumstances" of the case); United States v. Gori, 230 F.3d 44, 56 (2d Cir. 2000) (recognizing that "it is well established that officers may ask (or force) a suspect to move as part of a lawful Terry stop").

C.     The Search Of The Car Was Alternatively Justifiable As A Search Pursuant To The Search-Incident-To-Arrest Exception To The Warrant Requirement

The defendant apparently concedes, as discussed above, that the officers had probable cause to arrest the defendant, prior to arriving on the scene, based on Detective Copeland's investigation regarding the defendant's armed drug dealing activities.[7]  Because the defendant's arrest took place

---

[7]  Pursuant to D.C. Code sec. 23-581(a)(1), a law enforcement officer "may arrest, without a warrant having previously been issued therefore — (A) a person who he has probable cause to believe has committed or is committing a felony . . ."  See also Virginia v. Moore, No. 06-1082, 2008 WL 1805745 (U.S. April 23, 2008) ("While our opinion [in Michigan v. DeFillippo, 443 U.S. 31, 36 (1979)] said that '[w]hether an officer is authorized to make an arrest ordinarily depends, in the first instance, on state law,' it also said that a warrantless arrest satisfies the Constitution so long as the officer has 'probable cause to believe that the suspect has committed or is committing a crime.'")

soon after the search of the car in this case, it was authorized by the search-incident-to-arrest exception,[8] and it is of no significance that the search of the car came before the actual arrest.

The Supreme Court has long-recognized the exception to the warrant requirement for searches conducted incident to arrest. Chimel v. California, 395 U. S.752 (1969). Incident to arrest, police may search both the arrestee's person "[a]nd the area into which an arrestee might reach in order to grab a weapon or evidentiary items." Id. at 763. In New York v. Belton, 453 U. S. 454 (1981), the Supreme Court held that the search-incident exception allows officers to search the entire passenger compartment of a vehicle incident to the arrest of an occupant of the car. The Court added that there was no need to justify the search by showing that the particular arrest involved evidence preservation or safety concerns, explaining that (1) once probable cause was established, the search required no additional constitutional justification, and (2) it was important to employ a "settled principle to a recurring factual situation" so that citizens would understand the scope of their constitutional protections and police officers would understand the scope of their authority. Id. at 460-61. Reasoning that "the arrest of a suspect who is next to a vehicle presents identical concerns regarding officer safety and the destruction of evidence as the arrest of one who is inside the vehicle," the Court subsequently construed Belton's "bright-line" rule to permit the search of a vehicle incident to the arrest of a recent occupant. Thornton v. United States, 541 U.S. 615, 621 (2004).

In Rawlings v. Kentucky, 448 U.S. 98, 111 (1980), the Supreme Court made it clear that a search need not always follow the arrest, but may sometimes precede it, holding that "[w]here the

---

[8]  Because the items recovered from the defendant's possession were similarly recovered during a valid search incident to his arrest – independent of the search warrant, there is also no grounds to suppress those items of evidence.

formal arrest followed quickly on the heels of the challenged search . . ., we do not believe it particularly important that the search preceded the arrest rather than vice versa." Accord United States v. Riley, 351 F.3d 1265, 1269 (D.C.Cir. 2003) (where "police had probable cause to arrest" before search, it was "of no import that the search came before the actual arrest); United States v. Powell, 483 F.3d 836 (D.C. Cir. 2007) (applying the teachings of Rawlings and Riley, and upholding a pre-arrest search where the police had probable cause to arrest before the search was conducted and formal arrest occurred soon after the search was completed).

Moreover, it is of no significance whether or not the officers actually had the subjective intent to arrest the defendant, prior to the search, based on Detective Copeland's previous investigation. An officer's decision to make an arrest is evaluated objectively, not subjectively. See United States v. Anchondo, 156 F.3d 1043, 1045 (10th Cir.1998) (upholding search of suspect's person for narcotics before arrest based on probable cause, noting that "[w]hether or not the officer intended to actually arrest the defendant at the time of the search is immaterial"); see also Devenpeck v. Alford, 543 U. S.146, 153 (2004) (officer's "subjective reason for making arrest need not be the criminal offense as to which the known facts provide probable cause"); Whren v. United States, 517 U.S. 806, 813 (1996) ("Subjective intentions play no role in ordinary, probable-cause Fourth Amendment analysis"); United States v. Jackson, 415 F.3d 88, 91 (D.C. Cir. 2005) ("officers' actual motives for conducting the search [are] not relevant as long as [their] actions were objectively reasonable") (quoting United States v. Brown, 334 F.3d 1161, 1172 n.8 (D.C. Cir. 2003)); Holmes, 385 F.3d at 790 ("[t]he propriety of a search under the Fourth Amendment depends on an objective assessment of the officer's actions in light of the facts and circumstances confronting him at the time, and not on the officer's own subjective intent in executing the search") (internal quotation marks and

19

citation omitted); <u>United States v. Christian</u>, 187 F.3d 663, 669 (D.C. Cir. 1999) ("in assessing an officer's actions... we evaluate his conduct objectively, not subjectively").

> D.    Any Alleged Impropriety Associated With The Execution Of The Search Warrant On The Residence Could Not Justify The Suppression Of The Evidence Recovered From The Car, Given That The Search Of The Car Was Conducted And Justifiable <u>Separate And Apart From The Search Of The Residence</u>

Assuming for purposes of the defendant's motion that the officers somehow improperly relied on the warrant to search the house, any such impropriety could not justify the suppression of the items recovered from the car.  There were proper grounds, as discussed above, to support the search of the car independent of the warrant's validity and the search of the car did not bear a sufficiently close relationship to the search of the house to justify suppression.

The Supreme Court has recognized that "the indirect fruits of an illegal search or arrest should be suppressed when they bear a sufficiently close relationship to the underlying illegality." <u>New York v. Harris</u>, 495 U.S. 14, 19 (1990) (citations omitted).  However, the Supreme Court has emphasized "that attenuation analysis is only appropriate where, as a threshold matter, courts determine that the 'challenged evidence is in some sense the product of illegal government activity.'" <u>Id.</u> (citing <u>United States v. Crews</u>, 445 U.S. 463, 471 (1980).  Here, the defendant simply cannot satisfy this threshold inquiry, given that the search of the car occurred independent of the search of the house and was justifiable on entirely independent grounds.  <u>See</u> <u>Crews</u>, 445 U.S. 463 (refusing to suppress victim's in-court identification despite the defendant's illegal arrest);

The exclusionary rule is especially inapplicable here because the Fourth Amendment concern at issue – defendant's interest in having the search of his residence conducted following the issuance of a warrant based on probable cause – is not one that is causally linked to the seizure of the evidence

from the car, which was parked on a public street. See Hudson v. Michigan, 126 S. Ct. 2159, 2165 (2006) ("[s]ince the interests that were violated in this case [by the failure to knock and announce] have nothing to do with the seizure of the evidence, the exclusionary rule in inapplicable."); See also United States v. Ramirez, 523 U.S. 992, 996 (1998) ("Excessive or unnecessary destruction of property in the course of a search may violate the Fourth Amendment, even though the entry itself is lawful and the fruits of the search are not subject to suppression."); New York v. Harris, 495 U.S. 14, 20 (1990) (where police had probable cause to arrest defendant but violated Fourth Amendment by arresting him in his home without an arrest warrant, subsequent confession by defendant at police station not subject to suppression since the confession was not the product of arresting Harris in his home rather than on the street); United States v. Hector, 474 F.3d 1150, 1154-55 (9th Cir. 2007) (while failure to display search warrant during search may have violated the Fourth Amendment, suppression not appropriate since interest protected by display requirement, preventing breaches of the peace by dispelling any suspicion that search is illegitimate, did not implicate the seizure of the evidence described in the search warrant); Artis v. United States, 802 A.2d 959, 967-68 (D.C. 2002) (even assuming searching agents violated Fourth Amendment by having reporters accompany them on search, suppression not appropriate since reporter's presence did not alter the scope of the search under the warrant), cert. denied, 538 U.S. 1045 (2003).

CONCLUSION

WHEREFORE, the government respectfully requests that the Court deny defendant's motion to suppress evidence, statements, and other information.

Respectfully submitted,

JEFFREY A. TAYLOR

21

UNITED STATES ATTORNEY


                    /s/
By:     OPHER SHWEIKI
        Assistant United States Attorney
        Bar No. 458776
        Federal Major Crimes Section
        555 4th Street, N.W.
        Washington, D.C. 20530
        (202) 353-8822
        Opher.Shweiki@usdoj.gov

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the "GOVERNMENT'S SUPPLEMENTAL POST-HEARING BRIEF IN OPPOSITION TO DEFENDANT'S MOTION TO SUPPRESS EVIDENCE, STATEMENTS AND OTHER INFORMATION" was served upon counsel of record for the defendant, Jerry Ray Smith, Esq., 717 D Street, N.W., Suite 400, Washington, D.C. 20004, through the electronic court filing system, this 24th day of April 2008.

_____/s/_____

OPHER SHWEIKI